UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KATHY TAYLOR,

            Plaintiff,                                  Hon. Ellen S. Carmody

v.

                                              Case No. 1:11-cv-1308

COMMISSIONER OF
SOCIAL SECURITY,

            Defendant.

_____/


## OPINION

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Social Security Act. On March 2, 2012, the parties agreed to proceed in this Court for all further proceedings, including an order of final judgment. (Dkt. #11).

        Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 36 years old on her alleged disability onset date. (Tr. 19, 152). She successfully completed high school and worked previously as a pharmacy technician. (Tr. 26, 105-200).

Plaintiff applied for benefits on October 1, 2008, alleging that she had been disabled since April 12, 2006, due to depression, anxiety, and kidney stones. (Tr. 19, 152-59, 207). Plaintiff's applications were denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 100-51). On March 21, 2011, Plaintiff appeared before ALJ James Prothro, with testimony being offered by Plaintiff and vocational expert, James Lozer. (Tr. 36-95). In a written decision dated April 21, 2011, the ALJ determined that Plaintiff was not disabled. (Tr. 17-27). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-6). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

X-rays of Plaintiff's cervical spine, taken May 25, 2006, revealed the following:

> The cervical vertebral body height and alignment are well maintained. Minimal spurring is seen both anteriorly and posteriorly at C5-6 and C6-7. The intervertebral disk spaces are well preserved. The prevertebral soft tissues are normal. No acute fracture or subluxation is seen. On the oblique images there is no significant osseous encroachment of the neural foramen on either side. The C1-C2 relationship is within normal limits.

(Tr. 298).

On August 4, 2006, Plaintiff participated in a CT examination of her abdomen and pelvis the results of which revealed several renal stones one of which was causing "mild to moderate left hydronephrosis and moderate left ureteral dilation." (Tr. 329). On August 5, 2006, Plaintiff underwent a lithotripsy[1] procedure, performed by Dr. K. Kronner, to treat her kidney stones. (Tr. 322-23). On September 20, 2006, Plaintiff underwent another lithotripsy procedure to treat "right renal calculi." (Tr. 312-13).

X-rays of Plaintiff's abdomen, taken October 13, 2006, revealed the following:

> There is a 2-mm calcification over the midportion of the left kidney which is unchanged and there may be additional tiny calcifications over each kidney, but the larger calcifications which were present over both lower poles previously are no longer seen, consistent with interval passage and/or lithotripsy. No ureteral calculi are suspected radiographically. There is no evidence of intestinal obstruction.

(Tr. 354).

On August 15, 2007, Plaintiff participated in a CT examination of her abdomen and

---

[1] Lithotripsy is "a medical procedure that uses shock waves to break up stones in the kidney, bladder, or ureter (tube that carries urine from [the] kidneys to [the] bladder)" after which "the tiny pieces of stones pass out of [the] body in [the] urine." *See* Lithotripsy, available at http://www.nlm.nih.gov/medlineplus/ency/article/007113.htm (last visited on March 26, 2013).

pelvis the results of which revealed "numerous bilateral nonobstructing renal stones," but "no current evidence of hydronephrosis or any suspicious ureteral stones." (Tr. 327). On January 7, 2008, Plaintiff participated in a CT examination of her abdomen and pelvis the results of which revealed "bilateral nonobstructing renal calculi," but "no evidence of obstructive uropathy." (Tr. 324).

On May 5, 2008, Plaintiff participated in a CT examination of her head the results of which were "negative." (Tr. 391). On June 23, 2008, Plaintiff participated in a treadmill stress test the results of which revealed the following: (1) "normal distribution of isotope at stress and rest;" (2) "no reversible ischemia or prior infarction"; (3) "normal thickening throughout the myocardium"; and (4) "average exercise capacity without chest pain." (Tr. 411).

X-rays of Plaintiff's abdomen, taken October 22, 2008, revealed "bilateral small renal nonobstructing calculi," but "no apparent ureteral calculus." (Tr. 350).

On January 19, 2009, Plaintiff participated in an MRI examination of her lumbar spine, the results of which revealed "no evidence of any significant central canal stenosis or neural foraminal encroachment." (Tr. 463).

On January 26, 2009, Plaintiff was examined by Dr. Shelley Freimark. (Tr. 577). The results of this examination revealed the following:

> [Plaintiff] had an MRI scan done of the lumbar spine, which was essentially normal. It just showed some minimal disc bulging at L5-S1, but for her age group that is normal. There were no disc herniations and no central or neural foraminal encroachment at any level. She continues to have reports of significant low back pain and pain into the right thigh at times. This may be more myofascial or joint related pain.

(Tr. 577).

On March 16, 2009, Plaintiff was examined by Dr. Sean Growney. (Tr. 530-31).

Plaintiff reported that she was experiencing chronic low back pain, which she described as a "constant stabbing pain of severe intensity." (Tr. 530). Plaintiff reported that her pain "is worsened with twisting, squatting, bending backwards, lifting, and lying down" and "is relieved with heat, pain medications, and rest." (Tr. 530). The results of a physical examination revealed the following:

> Her neck is supple. Her upper extremities showed no signs of muscle atrophy, skin discoloration or edema. Examination of her thoracolumbar spine reveals normal curvature and range of motion. Kemp's test[2] is positive. Her sacroiliac joints are non-tender. Her lower extremities revealed no muscle atrophy, skin discoloration, or edema. She has 5/5 muscle strength in extensor halluses longus, ankle dorsiflexion and plantar flexion, as well as knee flexion and extension, bilaterally. She has normal sensation to sharp, dull, and light touch. She has 2/4 reflexes in the patellar and Achille's tendons bilaterally. She has 2/4 dorsalis pedis artery pulses. Patrick's test[3] is negative.

(Tr. 530-31). The doctor also reviewed "an MRI from earlier [that] year" which revealed "minimal degenerative disc disease, with mild facet arthropathy at several levels." (Tr. 531).

On March 24, 2009, Plaintiff participated in a consultive examination conducted by Dennis Mulder, Ed.D. (Tr. 440-44). Plaintiff reported that she was disabled due to depression, anxiety, and kidney stones. (Tr. 440). Plaintiff reported that she experiences lower back pain "daily and constantly" which, at its worst, is 10/10 is severity. (Tr. 440). Plaintiff reported that she cannot sit, stand, walk, or lie for "very long." (Tr. 440). Plaintiff reported that she "has no interest or

---

[2] Kemp's test (also referred to as the lumbar quadrant test) is designed to assess the lumbar spine facet joints. *See* Lumbar Quadrant Test, available at http://www.physio-pedia.com/Lumbar_Quadrant_Test (last visited on March 26, 2013).

[3] FABER (or Patrick) test is "a screening test for pathology of the hip joint or sacrum." *See* Special Tests of the Lower Extremity, available at http://physicaltherapy.about.com/od/orthopedicsandpt/ss/LEspecialtests_2.htm (last visited on March 20, 2013). The test is performed by placing the patient in the supine position and then flexing one leg and placing the foot of that leg on the opposite knee. The tested then slowly presses down on the superior aspect of the tested knee joint lowering the leg into further abduction. The motion performed as part of this test is referred to as FABER - **F**lexion, **AB**duction, **E**xternal **R**otation at the hip. The results are positive if the patient experiences "pain at the hip or sacral joint, or if the leg can not lower to point of being parallel to the opposite leg." *Id.*

motivation. . .cries at times and will isolate herself from others. . .has panic attacks several times a day. . .[and] does not like to go out in public." (Tr. 440). Plaintiff also reported that she was unable to leave home without accompaniment. (Tr. 440).

Plaintiff reported that she "lives in an apartment with her son and daughter" and "gets along good with both of them." (Tr. 441). Plaintiff reported that she "gets along wonderful with her daughter who lives at college" and "gets along good with her ex-husband." (Tr. 441). With respect to her daily activities, Plaintiff reported that she helps her children prepare for school, performs "some household chores," reads, and watches television. (Tr. 442). Plaintiff reported that in the evenings she helps her children with their homework, watches television, and plays video games with her children. (Tr. 442). Plaintiff reported that she "spends most of her time" reading. (Tr. 441). Plaintiff exhibited "no posture or gait problems." (Tr. 442). Plaintiff was cooperative and pleasant and the results of the mental status examination were unremarkable. (Tr. 442-43). Plaintiff was diagnosed with major depressive disorder, recurrent, moderate, and panic disorder without agoraphobia. (Tr. 443). Plaintiff's GAF score was rated as 50.[4] (Tr. 443). The doctor concluded:

> The potential for the patient becoming gainfully employed in a simple, unskilled work situation on a sustained and competitive basis is guarded to fair pending medical resolution. She appeared to have no difficulty understanding, remembering, and following through with simple instructions. She may be able to function in a work situation that does not involve extensive physical exertion.

(Tr. 444).

On April 28, 2009, Plaintiff was examined by Dr. Sean Growney with Michigan Pain

---

[4] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 50 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning." DSM-IV at 34.

Consultants. (Tr. 590). Plaintiff reported that she was continuing to suffer "severe" back pain for which recent facet injections "did not provide her adequate pain relief." (Tr. 590). Plaintiff told the doctor that she was "requesting additional treatment, as her pain is intolerable." (Tr. 590). Plaintiff exhibited "diffuse tenderness and spasm into the paravertebral muscles," but "her extremities reveal no muscle atrophy, skin discoloration or edema." (Tr. 590). Plaintiff reported that she was presently "taking her limit of Darvocet" and "is looking for something that will provide her some better pain relief." (Tr. 590). Dr. Growney agreed to provide Plaintiff with MS Contin. (Tr. 590).

On April 29, 2009, Plaintiff participated in a consultive examination conducted by Dr. Donald Sheill (Tr. 554-59). Plaintiff reported she was experiencing back pain, kidney stones, and "mental health issues." (Tr. 554). The results of a physical examination revealed the following:

> The abdomen is soft, benign, and nontender with no organomegaly or mass. Extremities symmetric. The hands are free of atrophy, swelling, or deformity, fine and gross dexterity is intact, and sensory is full. The spine is straight without deformity or focal tenderness. Axial loading and SLR are negative. The right hip is mildly irritable on external rotation and slightly tender but this has not been a problem for her. Sensory is full in the lower extremities. The patient exhibits few pain behaviors. Her gait is normal and she has good strength on heels and toes. Squat and recover is limited by the discomfort. She does not exhibit lateralizing neurologic findings. She maintains good eye contact and does not appear outwardly sad or anxious.

(Tr. 554-55). The doctor concluded that Plaintiff was capable of working so long as she not perform "substantial bending, twisting, or lifting." (Tr. 555).

On July 6, 2009, Plaintiff participated in an MRI examination of her brain, the results of which were "unremarkable." (Tr. 918).

On July 20, 2009, Dr. Growney discharged Plaintiff from his care because a recent

drug test "reveals methadone and an unknown benzodiazepine." (Tr. 583). The doctor noted that

"the methadone was not prescribed by us and is not listed on any previous medication sheet" and "is

a direct violation of your narcotics agreement with us." (Tr. 583).

On September 14, 2009, Plaintiff underwent surgery to remove multiple left renal

calculi. (Tr. 888-89).

On October 19, 2009, Plaintiff was examined by Dr. Steven VanDoornik. (Tr. 938-

40). Plaintiff reported that she was experiencing "tremor, muscle jerking, and headache." (Tr. 938).

The results of a physical examination revealed the following:

> Her head is atraumatic and normocephalic. Her neck is supple.
> Carotids are full and symmetric. No cranial or cervical bruits are
> appreciated. Distal pulsations are intact in her extremities. No skin
> rash or neurocutaneous abnormality is appreciated. She is alert and
> oriented. Language, memory, and concentration are normal. Cranial
> nerves II through XII are normal. Her fundi are benign. Tone, bulk,
> and muscle power are normal throughout. She has a mild positional
> tremor. No myoclonus or intention tremor is appreciated. Gait and
> station are normal. Romberg[5] is negative. Sensation is symmetric in
> her extremities. Deep tendon reflexes are 2 in the upper extremities,
> 3 at the knees, 2 at the ankles and symmetric at all levels.

(Tr. 939).

The doctor concluded that Plaintiff's headaches were due to "analgesic overuse

phenomena." (Tr. 939). As for Plaintiff's complaints of tremor and muscle jerking, the doctor

scheduled Plaintiff to participate in a series of laboratory tests. (Tr. 939-40). On October 20, 2009

Plaintiff participated in an electroneuromyography examination, the results of which were "normal."

(Tr. 941). The doctor further reported that "laboratory studies [performed the same day] including

---

[5] Romberg test is a neurological test designed to detect poor balance. *See* Romberg Test, available at
http://www.mult-sclerosis.org/RombergTest.html (last visited on March 26, 2013). The patient stands with her feet
together and eyes closed. The examiner will then push her slightly to determine whether she is able to compensate and
regain her posture. *Id.*

CPK, ferritin, sedimentation rate, and ANA are all normal as well." (Tr. 941). On October 21, 2009,

Plaintiff participated in an electroencephalogram examination, the results of which were "normal."

(Tr. 885).

On October 27, 2009, Plaintiff was examined by Dr. Randolph Russo. (Tr. 606-07).

Plaintiff reported that she was experiencing low back pain with numbness extending into her lower

extremities. (Tr. 606). Plaintiff rated her back pain as "8/10 throughout the day." (Tr. 606). The

results of a physical examination revealed the following:

> Gait: She walks with a normal gait pattern. Toe and heel walking are
> within normal limits. Spine: She demonstrates a normal position to
> her spine. She forward flexes and extends fully with a mild ache in
> her back with extension and right and left lateral side bending. With
> flexion at 40 degrees she complains of back pain. Musculoskeletal:
> Hip range of motion is full. FABER's is negative. Palpation: She
> demonstrates moderate tenderness across the lumbosacral spine.
> There is no paraspinal hypertonicity. There is no thoracic or cervical
> tenderness. Neurologic: Strength on manual muscle testing is equal
> and symmetric in all four extremities. Sensory examination on light
> touch and pinprick is intact. Reflexes are symmetric. Straight leg
> raise is negative. Reversed straight leg raise is negative. Plantar
> responses are downgoing. There is no evidence of clonus.
> Hoffmann's[6] is nonreactive.

(Tr. 606-07).

The doctor also noted that an "MRI scan of the lumbosacral spine demonstrates mild

disc desiccation at L5-S1 without evidence of a disc protrusion, central canal or neural foraminal

stenosis." (Tr. 607). Dr. Russo concluded that, "I do not have an explanation for the symptom

complex that she is experiencing" and "from a spine specialist standpoint I am not able to provide

---

[6] Hoffman's sign is an indicator of a number of neurological conditions including cervical spondylitis, other forms of spinal cord compression, and multiple sclerosis. *See* Hoffman's Sign, available at, http://www.mult-sclerosis.org/Hoffmanssign.html (last visited on March 26, 2013).

her any further guidance or medical care at this time." (Tr. 607).

Treatment notes dated February 15, 2010, indicate that Plaintiff was discharged from treatment with Community Mental Health of Ottawa County. (Tr. 612). Plaintiff was discharged from treatment because she "missed nine out of eleven scheduled [counseling] appointments." (Tr. 612). The counselor further noted that Plaintiff "did not practice the skills I taught her, and she did not read the materials I gave her." (Tr. 612). The counselor further noted that Plaintiff "was not taking advantage of our full array of services." (Tr. 612). The counselor concluded that Plaintiff's mental status was "satisfactory" and her prognosis was "good." (Tr. 612).

On March 3, 2010, Plaintiff participated in an overnight sleep study, the results of which were "normal" with "no evidence of any significant sleep apnea." (Tr. 670-72).

On March 26, 2010, Plaintiff participated in an MRI examination of her lumbar spine, the results of which revealed: (1) no evidence of acute vertebral body fracture; (2) no significant central canal or neural foraminal narrowing; (3) no focal posterior disc protrusions; and (4) "minimal" facet degenerative change at several levels. (Tr. 689).

On April 14, 2010, Plaintiff participated in a deep venous ultrasonography examination, the results of which revealed no evidence of deep venous thrombosis. (Tr. 859).

On April 20, 2010, Plaintiff was examined by Dr. Sarah Kane-Smart. (Tr. 710-12). Plaintiff reported that she was continuing to experience worsening lower back pain which radiated into her lower extremities. (Tr. 710). Plaintiff reported that her back pain was "aggravated by shoveling and carrying a laundry basket." (Tr. 710). Plaintiff also reported that she recently "mowed the lawn and had to sit down to rest." (Tr. 710). The doctor observed that Plaintiff "walks without antalgia" and "transitions positions with minimal pain behavior." (Tr. 711). An examination of

Plaintiff's pelvis revealed that "pelvic alignment looks good." (Tr. 711). Straight leg raising was negative and an inspection of Plaintiff's lumbosacral spine revealed "normal alignment" and that "paraspinal muscle tone is within normal limits." (Tr. 711). An examination of Plaintiff's buttocks revealed that the "piriformis muscle has moderate tightness and is tender to palpation" bilaterally. (Tr. 711). Plaintiff was diagnosed with piriformis syndrome, hamstring tightness, and lumbago, and instructed to participate in therapy. (Tr. 711).

On May 3, 2010, Plaintiff participated in a stress echocardiogram examination, the results of which "failed to demonstrate evidence of ischemia." (Tr. 851).

Treatment notes dated October 22, 2010, indicate that Plaintiff "fell off a ladder last week when working on her house." (Tr. 944). Plaintiff was examined following this occurrence, "but had no serious injuries." (Tr. 944). Treatment notes dated November 23, 2010, indicate that Plaintiff's headaches "have improved over the last few months" and have "respond[ed] well to treatment" with medication. (Tr. 946).

Treatment notes dated February 25, 2011, indicate that Plaintiff was experiencing "limited active motion of the right shoulder, both with respect to elevation, external rotation, and internal rotation." (Tr. 1064). On February 28, 2011, Plaintiff participated in an MRI examination of her right shoulder, the results of which revealed no evidence of a rotator cuff tear. (Tr. 1061-62).

At the administrative hearing, Plaintiff testified that she could "maybe" lift a gallon of milk. (Tr. 67). Plaintiff testified that she was unable to climb a flight of stairs without stopping because of numbness and shooting pain down her lower extremities. (Tr. 67-68). Plaintiff reported that she could stand for 5-10 minutes before she had to move around due to "shooting pain" in her lower extremities. (Tr. 68-69). Plaintiff reported that she can sit for "about 45 minutes." (Tr. 69).

Plaintiff testified that she could walk "about two" city blocks before she would begin to experience "severe pain" in her lower extremities. (Tr. 69). Plaintiff reported that she experiences "severe" migraine headaches for which she goes to the emergency room to receive "shots of Toradol. . .and something else." (Tr. 72). Plaintiff reported that on a "typical" day she helps her children prepare for school, drives them to school, returns home and performs housecleaning, and otherwise attempts to be as active as possible. (Tr. 79).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[7] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders,

---

[7] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) recurrent kidney stones; (2) obesity; (3) dysthymic disorder; (4) panic disorder; (5) personality disorder; (6) history of migraine headaches; and (7) degenerative disc disease with early facet arthropathy, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 19-22).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform work subject to the following limitations: (1) she can lift/carry 20 pounds occasionally and 10 pounds frequently; (2) during an 8-hour work day with normal breaks, she can stand/walk for six hours and sit for six hours; (3) she can frequently balance, kneel, crawl, and climb ramps and stairs; (4) she can occasionally climb ladders, ropes, and scaffolds; (5) she can occasionally stoop and crouch; and (6) she is limited to simple work. (Tr. 23).

The ALJ concluded that Plaintiff was unable to perform any of her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence

that a significant number of jobs exist in the national economy which Plaintiff can perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert James Lozer.

The vocational expert testified that there existed approximately 24,000 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 87-88). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

a.     The ALJ's RFC Determination is Supported by Substantial Evidence

Plaintiff asserts several arguments that the ALJ's RFC determination is not supported by substantial evidence, none of which are persuasive.

First, Plaintiff asserts that the ALJ "invented his own GAF [score] of 51-60, whereas

15

the only evidence of a GAF [score] was below 51, in the next more debilitating category." Plaintiff's argument constitutes a gross exaggeration of the facts. As noted above, following a March 24, 2009 consultive examination, Dennis Mulder reported Plaintiff's GAF score as 50, which correlates to serious symptoms or impairment in functioning. The ALJ, in his opinion, accurately observed that "Dr. Mulder provided that the claimant's [GAF score] was 50." (Tr. 25). However, the ALJ then wrote that "a GAF code of 51 to 60 [represents] moderate symptoms or moderate difficulty in social, occupational, or school functioning." (Tr. 25). This is an accurate, but obviously inapplicable, statement.

While the ALJ erroneously cited to the definition of a GAF score that Plaintiff did not receive, he did not "invent" a GAF score. Instead, the ALJ accurately reported Plaintiff's GAF score, but simply misstated the definition of such. Plaintiff's argument would be much more persuasive if the ALJ had indicated that a GAF score of 50 correlated to moderate symptoms, as such would be evidence of a prejudicial error rather than a simple and, ultimately, harmless error. As the Sixth Circuit has recognized, a GAF score "may help an ALJ assess mental RFC, but it is not raw medical data." *Kornecky v. Commissioner of Social Security*, 167 Fed. Appx. 496, 503 n.7 (6th Cir., Feb. 9, 2006). Accordingly, the ALJ is not required "to put stock in a GAF score in the first place." *Id.* at 511 (citing *Howard v. Commissioner of Social Security*, 276 F.3d 235, 241 (6th Cir. 2002)). Furthermore, the record simply does not support the notion that Plaintiff suffers "serious" emotional symptoms or impairment in functioning.

Plaintiff next argues that the ALJ's RFC fails to sufficiently account for her mental limitations. The Court disagrees. As the ALJ accurately observed, Plaintiff's emotional impairments have been treated with conservative methods and Plaintiff "has had no recent mental health

16

interventions or hospitalizations." (Tr. 24). Plaintiff's reported activities reflect that her emotional impairments would impose only minimal work-related limitations. Even Dr. Mulder, on whose opinion Plaintiff places great reliance, concluded that Plaintiff demonstrated "no difficulty understanding, remembering, and following through with simple instructions." In sum, the ALJ's conclusion that Plaintiff was limited to simple work is supported by substantial evidence and sufficiently accounts for Plaintiff's non-exertional limitations.

Plaintiff next argues that the ALJ's conclusion that she experiences only mild limitations in social interaction is not supported by substantial evidence. First, as previously discussed, the ALJ's RFC sufficiently accounts for Plaintiff's non-exertional limitations. Moreover, the record supports the conclusion that Plaintiff is only mildly limited in the area of social interaction. As the ALJ accurately observed, Plaintiff reported that she gets along well with her family and was cooperative and pleasant when examined by Dr. Mulder. Moreover, contemporaneous treatment notes do not support the argument that Plaintiff experiences more than mild limitations with respect to social interaction.

b.    The ALJ Properly Evaluated the Medical Evidence

As noted above, Plaintiff participated in a March 24, 2009 consultive examination conducted by Dr. Mulder and an April 29, 2009 consultive examination conducted by Dr. Sheill. Dr. Mulder concluded that Plaintiff's potential for "becoming gainfully employed in a simple, unskilled work situation on a sustained and competitive basis is guarded to fair pending medical resolution." Dr. Sheill concluded that Plaintiff was capable of working so long as she not perform "substantial bending, twisting, or lifting." Plaintiff asserts that she is entitled to relief because the

17

ALJ failed to explain why he rejected these particular opinions.

First, because Dr. Mulder and Dr. Sheill examined Plaintiff on only one occasion their opinions are entitled to no special deference. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994); *Atterberry v. Secretary of Health and Human Services*, 871 F.2d 567, 571-72 (6th Cir. 1989). Moreover, the Court fails to discern how the opinions in question are inconsistent with the ALJ's RFC determination. Dr. Mulder's observation that Plaintiff's prognosis was guarded to fair is so vague and nebulous as to be virtually meaningless. Moreover, as Dr. Mulder further concluded, Plaintiff was capable of "understanding, remembering, and following through with simple instructions" and can perform work "that does not involve extensive physical exertion." In sum, the results of Dr. Mulder's examination of Plaintiff, including his resulting opinions, are consistent with the ALJ's RFC determination. Likewise, the results of Dr. Sheill's examination, as well as his conclusions, are entirely consistent with the ALJ's RFC determination. Accordingly, this argument is rejected.

c.      The ALJ Properly Discounted Plaintiff's Subjective Allegations

As noted above, Plaintiff testified at the administrative hearing that she suffered from far greater limitations than recognized by the ALJ. Specifically, Plaintiff reported that she was unable to climb a flight of stairs without stopping because of numbness and shooting pain down her lower extremities. Plaintiff reported that she was unable to stand for longer than 5-10 minutes because of "shooting pain" in her lower extremities. Plaintiff testified that she could walk "about two" city blocks before she would begin to experience "severe pain" in her lower extremities. Plaintiff also reported that she experiences "severe" migraine headaches for which she goes to the

emergency room for treatment. The ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 23). Plaintiff asserts that the ALJ improperly discounted her subjective allegations.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added); *see also*, *Grecol v. Halter*, 46 Fed. Appx. 773, 775 (6th Cir., Aug. 29, 2002) (same). As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled." 20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)) *Hash v. Commissioner of Social Security*, 309 Fed. Appx. 981, 989 (6th Cir., Feb. 10, 2009). Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). This standard is often referred to as the *Duncan* standard. *See Workman v. Commissioner of Social Security*, 105 Fed. Appx. 794, 801 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the

19

alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony"). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

As the ALJ correctly observed, the medical evidence does not support Plaintiff's subjective allegations of extreme pain and limitation. Specifically, as the ALJ concluded, "extensive evaluation has not disclosed a musculoskeletal or neurological impairment that might account for the alleged debilitating back pain symptoms" that Plaintiff alleges. (Tr. 23-24). As noted above, Plaintiff has reported engaging in a variety of activities, including helping her children prepare for school, driving them to school, helping them with their homework, performing household chores, watching television, playing video games, shoveling, mowing the lawn, and performing household repairs. Plaintiff also reported that she "spends most of her time" reading. As the ALJ concluded,

Plaintiff's reported activities do not support her subjective allegations of such extreme pain and limitation. As the ALJ also observed, none of Plaintiff's treating physicians have imposed on Plaintiff limitations which are inconsistent with the ALJ's RFC determination.

As the ALJ further observed, Plaintiff was terminated from counseling because she failed to attend scheduled counseling sessions and "did not practice the skills she had been taught and. . .did not read the materials that she had been given." (Tr. 24). Such evidence suggests that Plaintiff's allegations of pain and limitation are not fully credible. *See, e.g., Rainey v. Commissioner of Social Security*, 2011 WL 4529141 at *9 (W.D. Mich., Sept. 8, 2011) ("a claimant's failure to follow prescribed treatment is evidence supporting an ALJ's factual finding that the claimant's testimony was not fully credible").

In support of her position, Plaintiff has, again, mischaracterized the ALJ's opinion. For example, Plaintiff asserts that the ALJ incorrectly stated that she had "no recent mental health treatment." This is not accurate. The ALJ instead observed that Plaintiff "has required only conservative therapy, primarily consisting of the prescription of medications, physical therapy, and counseling. . .[and] has had no recent mental health interventions or hospitalizations." (Tr. 24). The ALJ subsequently discussed in detail the then-current mental health treatment Plaintiff was receiving through the Outpatient Behavioral Health Services at Holland Hospital. (Tr. 24). There exists a significant distinction between observing that a claimant has received conservative treatment and has not experienced any recent "interventions or hospitalizations," as the ALJ observed, and simply stating that a claimant has had "no recent mental health treatment," as Plaintiff alleges. Plaintiff's argument that the ALJ improperly "played doctor" is likewise unpersuasive. As previously noted, the ALJ is tasked with weighing the evidence of record and resolving the conflicts therein. That

Plaintiff disagrees with the ALJ's judgment in this regard is not tantamount to the ALJ "playing doctor."

In sum, the ALJ's decision to accord limited weight to Plaintiff's subjective allegations is supported by substantial evidence. Accordingly, this argument is rejected.


## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**. A judgment consistent with this opinion will enter.


Date: March 28, 2013                     /s/ Ellen S. Carmody
                                        ELLEN S. CARMODY
                                        United States Magistrate Judge